UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Case No.: No. 04-CR-10391-NMG |
| | ) | |
| vs. | ) | |
| | ) | |
| ROBERT WYATT | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT ROBERT WYATT'S
MOTION *IN LIMINE* TO EXCLUDE CERTAIN EVIDENCE**

Defendant Robert Wyatt submits this memorandum in support of his motion *in limine* to exclude certain evidence, by way of both exhibits and/or testimony (during direct or cross-examination), that he believes the government may try to introduce at trial.

## I.    FACTUAL BACKGROUND

On December 7, 2004, defendant was arrested, by way of criminal complaint, in connection with a fire that occurred at a residential building located at 264 Putnam Street, Cambridge, Massachusetts (the "Building"), on November 14, 2004. On December 22, 2004, defendant was indicted on one count of arson (18 U.S.C. § 844(i)), and one count of possessing a destructive device (to wit, a "Molotov cocktail") in furtherance of the arson (18 U.S.C. § 924(c)(1)(A)).

Relevant to the present motion, the government alleges the following:

On the night before the fire, defendant's girlfriend, Lisa Jackson, accompanied Christine Brown to Brown's apartment (apartment no. 2 in the Building), where she lived with her boyfriend, Norman Drayton. While at the apartment, a physical altercation ensued between Jackson on the one hand, and Brown and Drayton on the other. Both

sides called 911, and the police responded.  According to Brown and/or Drayton, sometime thereafter Jackson returned and yelled words to the effect of "my boyfriend will kill you" and "my boyfriend will fire you out."

At the time of the incident, Jackson lived with her mother, Isabelle Jackson, at 808 Memorial Drive in Cambridge, Massachusetts, approximately a four-minute walk to the Building, according to the government.  Allegedly during the early morning of November 14, 2004 (a day after the altercation involving Jackson at the Building), surveillance video from 808 Memorial Drive depicts an individual leaving that property through a fire escape door at approximately 4:15 a.m. with a bag in his or her hand and returning at approximately 4:36 a.m. without the bag.  The Cambridge Fire Department ("CFD") responded to the fire at 4:32 a.m.  According to the government, although no witness was able to identify the individual on the video, the "individual appears to be Wyatt."  Affidavit of ATF Agent Matthew Kelsch (at 4, ¶ 8) (attached hereto as Exhibit A).

During the fire suppression, the CFD allegedly discovered – outside of the Building – an unused Molotov cocktail, consisting of a clear glass pint bottle of Smirnoff Ice, a cloth wick, and a liquid allegedly later determined to be gasoline.  The Massachusetts State Police Crime Laboratory subsequently tested the bottle for fingerprints but none were found.  Inside the apartment, Drayton allegedly observed a burning glass bottle with a wick in it, and a member of the CFD allegedly observed various spot fires and the odor of gasoline.  Despite these alleged observations, however, after utilizing a dog specially trained to detect the presence of gasoline and after testing several samples from inside the apartment, the government did not discover any gasoline

or gasoline residue inside the apartment.  Moreover, despite its specific attempt to find a glass bottle (or fragments thereof) inside the apartment, the government was unable to do so.

Nonetheless, according to the government's summary of expert testimony provided to defendant, the government intends to introduce <u>expert</u> opinions from at least three experts that the fire was caused by the use of one or more Molotov cocktails.

## II.  <u>ARGUMENT</u>

For the reasons set forth below, defendant seeks to exclude any reference to the following categories of evidence (both testimony and exhibits):

### A.  Expert Testimony Opining that a Molotov Cocktail Caused the Fire

#### 1.  This Purported Expert Testimony Violates Federal Rule of Evidence 702.

There is no basis for <u>expert</u> testimony that the fire in question was caused by the use of a Molotov cocktail.  Under Federal Rule of Evidence 702, courts may admit expert testimony only if such testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue."  Accordingly, expert testimony does not merit admission where a jury is capable of understanding the evidence without the assistance of an expert. *United States. v. Stokes*, 338 F.3d 21, 26 (1st Cir. 2004), *vacated on other grounds*, 256 F.3d 59, 65 (1st Cir. 2001); *United States. v. Montas*, 41 F.3d 775, 783 (1st Cir. 1994). Indeed, given the costs and risks associated with expert testimony, courts caution against the admission of expert testimony concerning readily understood matters.  *United States v. Brien*, 59 F.3d 274, 277 (1st Cir. 1995); *see Montas*, 41 F.3d at 784.  As the Advisory Note to Rule 702 states:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be

3

> qualified to determine intelligently and to the best degree the particular
> issue without enlightenment from those having a specialized
> understanding of the subject involved in the dispute.

Here, the government effectively seeks to rebut its own scientific evidence with expert opinions to the contrary. Despite the fact that on-the-scene evidence collection and subsequent scientific testing proved negative for the presence of a Molotov cocktail inside the apartment, the government seeks to adduce expert opinions from Massachusetts State Trooper Donald Bossi, Cambridge Fire Lieutenant Brian Higgins and ATF Agent Edward House that at least one Molotov cocktail caused the fire.[1]

The bases of these purported opinions, however, clearly demonstrate that such "expert" testimony violates Rule 702. While purportedly relying on numerous factors for their initial expert opinion that the fire was incendiary in nature, their expert opinions as to the use of a Molotov cocktail boils down only to the following: (1) during fire suppression efforts, an unused Molotov cocktail was allegedly found outside the Building, and (2) one of the residents of the apartment allegedly saw a glass bottle with a wick burning inside the apartment. Clearly, the jury is "capable of understanding" these two non-scientific pieces of evidence "without the assistance of an expert," and thus expert testimony on the issue, taking the form of an ultimate conclusion as to the use of a Molotov cocktail, is patently impermissible. *See Stokes*, 338 F.3d at 26; *United States v. Sebaggala*, 256 F.3d 59, 65 (1st Cir. 2001); *Montas*, 41 F.3d at 783.

Additionally, Rule 702 only allows expert testimony if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The government cannot even come close to satisfying this test here.

---

[1] A copy of the government's summary of its experts' planned testimony is attached hereto as Exhibit B.

First, the testimony is not based upon sufficient facts or data. In large part, it is based on the hearsay statements of Drayton regarding his alleged observations during the fire. While in certain circumstances experts can rely on hearsay for their opinions, "the rationale for this exception to the rule against hearsay is that the expert, because of his professional knowledge and ability, is competent to judge for himself the reliability of the records and statements on which he bases his expert opinion." *United States v. Skodnek*, 896 F. Supp. 60, 66 n.8 (D. Mass. 1995) (citing *United States v. Williams*, 447 F.2d 1285, 1290 (5th Cir. 1971)). Here, of course, none of the government experts possess any "professional knowledge or ability" to judge the "reliability" of Drayton's alleged observations. *See id.* Moreover, to the extent that the expert testimony is also based on the alleged unused Molotov cocktail found outside of the Building, the government and its experts are unable to provide a nexus between this item and any evidence found inside the apartment. Accordingly, the first prong of Rule 702 is not met.

Second, the government experts' purported conclusions are not the <u>product</u> of any "principles or methods" whatsoever – much less reliable ones. *See* Fed. R. Evid. 702. Accordingly, the experts have not <u>applied</u> any "principles or methods" reliably to the facts of the case. *See id.* Instead, they simply infer – in the exact same way that a jury could, and without utilization of any of their "expertise" – that based on the hearsay evidence and proximate location of the alleged unused Molotov cocktail, the fire was caused by a similar device. Rule 702 does not countenance such testimony.

## 2. This Purported Expert Testimony Also Violates Rule 403.

Under circumstances like the present, where, in violation of Rule 702, an expert intends to offer an opinion based on evidence that a jury can readily understand, Rule 403

operates in tandem with Rule 702 to exclude such testimony. As the First Circuit has explained: "Expert testimony on a subject that is well within the bounds of a jury's ordinary experience generally has little probative value. On the other hand, the risk of unfair prejudice is real. By appearing to put the expert's stamp of approval on the government's theory, such testimony might unduly influence the jury's own assessment of the inference that is being urged." *Montas*, 41 F.3d at 784.

That is precisely the situation here. The government's theory is that the proximate location of an unused Molotov cocktail and the fact that a witness allegedly saw a bottle with a wick burning demonstrate that a Molotov cocktail caused the fire. This theory does not require <u>expert</u> testimony for a jury to understand, or to make the same inferential leap as the government does. However, the government seeks such testimony because it wishes to put (impermissibly and prejudicially) their experts' "stamp of approval" on the theory. *See id.*

Indeed, the prejudice here is even more pronounced than in the usual case. The government's experts' opinions are directly contrary to the scientific evidence generated by the government in the aftermath of the fire. Accordingly, the government seeks to confuse and mislead the jury by adducing expert opinions that rebut their own tests. In other words, the government wants their experts to testify that, although there is no scientific or other evidence within the unique province of their expertise to support the conclusion that a Molotov cocktail caused the fire, in their <u>expert</u> opinions, a Molotov cocktail was nonetheless used. This is improper. *See id.* ("expert testimony is unfairly prejudicial 'when the evaluation of the commonplace by an expert witness might supplant a jury's independent exercise of common sense'") (quoting *Scott v. Sears, Roebuck &*

*Co.*, 789 F.2d 1052, 1055 (4th Cir. 1986)).  Because such opinions are based on alleged

facts well within the bounds of the jury's ordinary experience, this is precisely the type of

expert testimony that the First Circuit has held impermissible under Rules 702 and 403.

*See Montas*, 41 F.3d at 784.

> **B.    Evidence of the Alleged Molotov Cocktail Found Outside of the Building**

The above assumes, *arguendo*, that the discovery of the alleged Molotov cocktail

found outside of the Building will be admissible evidence.  However, evidence of this

alleged device should be excluded because, if admitted, the dangers of unfair prejudice

and misleading the jury substantially outweigh its minimal probative value.  *See* Fed. R.

Evid. 403; *Williams v. Drake*, 146 F.3d 44, 48 (1st Cir. 1998).  As discussed above,

investigators failed to locate any evidence linking the alleged Molotov cocktail

discovered outside of the Building to the fire.  Specifically, despite substantial efforts,

including testing performed by a chemist at the Massachusetts State Police Crime

Laboratory of three samples taken from inside the apartment after the government

investigators deployed a dog trained to detect ignitable liquids, investigators could not

locate any evidence of the materials comprising a Molotov cocktail (*i.e.,* glass and

gasoline) anywhere inside the premises.  In short, there is simply no reliable nexus

between the alleged unused Molotov cocktail found outside of the Building and the fire

itself.  Accordingly, given the low probative value of this alleged Molotov cocktail, and

its great potential to prejudice defendant and mislead the jury, it should be excluded

under Rule 403.  *See Drake*, 146 F.3d at 48.

Moreover, from the evidence the government has produced to the undersigned to

date, it does not appear that the bottle found outside the Building contained enough

gasoline to be considered either a Molotov cocktail, or, more importantly a destructive device under 18 U.S.C. § 924(c)(1)(A).  The government has produced for inspection the empty bottle and a tiny vial of gasoline that was allegedly tested by the State Police Crime Laboratory.  However, the government has not produced any further liquids – gasoline or otherwise – that were contained in the bottle when first discovered.  Unless and until it does that, defendant cannot independently determine whether the item falls under § 924(c)(1)(A).  Common sense, however, suggests that a bottle containing only the amount of gasoline tested in the tiny vial is not a destructive device under that statute. Accordingly, the government's attempt to show that the presence of this item demonstrates the use of one or more Molotov cocktails is unfounded and extremely prejudicial.

### C.    The Surveillance Video of an Unidentified Individual Leaving and Entering 808 Memorial Drive

The surveillance video (and thus related still photographs taken from that video) depicting an individual allegedly leaving the apartment building where defendant's girlfriend and her mother lived prior to the fire, and returning after the fire, should be excluded because its probative value is far outweighed by its prejudice.  *See* Fed. R. Evid. 403.

As set forth in more detail below, the government has no witness who can offer an admissible opinion that the individual on the surveillance video is the defendant.  Further, the government cannot demonstrate that the individual on the video is the same individual who allegedly started the fire in question.  Nevertheless, the government appears to want to introduce the video to prove that defendant started the fire.  Because this conclusion requires two separate (and significant) unproven inferences, the video is

of minimal probative value. However, its prejudicial effect will be very real. Despite the lack of supporting evidence, the jury will likely conclude that the individual on the video is defendant simply because the government is showing the video at defendant's trial. This unfair assumption, in turn, will likely cause the jury to conclude – without proper evidence – that defendant is responsible for the fire in question. As such, the prejudicial effect of the video far outweighs any minimal probative value it may have, and it should therefore be excluded. *See* Fed. R. Evid. 403.

> **D.    Lay Opinion Testimony Regarding the Potential Identity of the Individual on the Video**

Alternatively, should the Court allow the government to show the video to the jury, it should, at minimum, exclude any lay opinion testimony as to the identity of the individual captured thereon pursuant to Rule 701. Admittedly, the First Circuit has allowed opinion testimony identifying a defendant from surveillance photographs. *See United States v. Jackman*, 48 F.3d 1, 4-6 (1st Cir. 1995). However, *Jackman* presented very different circumstances than the case at bar. The *Jackman* court held that "such testimony is admissible at least when the witness possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess, and when the photographs are not either so unmistakably clear or so hopelessly obscure that the witness is no better-suited than the jury to make the identification." *Id.* at 5-6. Here, there are two categories of potential witnesses to offer opinions as to whether the individual on the video is defendant – private individuals and law enforcement/fire personnel. Rule 701 precludes witnesses from either group from testifying.

As to the potential private witnesses, on December 22, 2004, the government showed Rhonda Oyuela and Dwayne Williams – together in a conference room at the

United States Attorney's Office – an image from the video surveillance depicting an individual leaving the apartment building at 808 Memorial Drive. Notably, this occurred two weeks <u>after</u> defendant had been arrested and two weeks <u>after</u> the government issued a press release and the B*oston Herald* ran an extremely prejudicial article detailing defendant's arrest and alleged crime.[2] Williams told the government investigators that he could not tell who the person was depicted in the image. Oyuela stated that the individual looked like defendant and that the individual is wearing a jacket that looked like one she had seen defendant wear, but she could not positively identify defendant as the person in the image.

The uncertainty of Oyuela's opinion renders it unhelpful – and thus inadmissible – under Rule 701. *Compare Jackman*, 48 F.3d at 3 (woman who had been married to defendant for 14 years testified that defendant <u>was</u> individual on surveillance photograph "and answered in the negative when asked if there was any doubt in her mind that it was he"). Here, Oyuela's testimony does not constitute a valid identification, and thus it has no probative value, while being extremely prejudicial to defendant.

To the extent that the government wants to adduce opinion testimony from law enforcement/fire personnel that the individual in the image is defendant, it should be precluded from doing so. There is no evidence that any such witness "possesses sufficiently relevant familiarity with the defendant that the jury cannot also possess." *Id.* at 4-5. Here, none of these government witnesses knew defendant prior to the incident in question, and thus they are not qualified to give opinion testimony as to his identity under Rule 701.

---

[2] A copy of the *Boston Herald* article is attached hereto as Exhibit C.

Another separate and independent reason exists to exclude any testimony from Oyuela as to the potential identity of the individual on the image: the "identification" procedure was unduly suggestive. As mentioned above, the government showed Oyuela this picture – when she was with Williams – just before she and Williams provided grand jury testimony in this case. Defendant had been arrested two weeks earlier, and in addition to the buzz the fire and arrest had generated in the neighborhood, the *Boston Herald* ran a story detailing his arrest.[3] In short, when the government showed Oyuela the image, she knew that defendant was suspected of being the person responsible for the fire and that the government sought her testimony to secure an indictment against him in connection with same. Under these circumstances, her uncertain testimony should be excluded.[4]

### E.    Expert Testimony as to Why Fingerprints Might not have Been Found on Bottle Outside of Building

The proffered testimony of Massachusetts State Trooper Wesley Wanagel should be excluded insofar as the government seeks an opinion from Wanagel as to why fingerprints might <u>not</u> have been recovered on the bottle in question. According to the government's summary of its expert testimony, after testifying that no fingerprints were recovered on the bottle, Wanagel will provide not less than five reasons (explicitly a non-exhaustive list) as to why fingerprints, <u>in general</u>, <u>might</u> not be left on an object after touching. Apparently, the government will make no attempt to tie any of Wanagel's

---

[3] As referenced above, the *Boston Herald* article was extremely prejudicial to defendant. The article referred to him as "an ex-con bent on hurting a woman," "who could face decades in federal prison," and who allegedly "confessed to his girlfriend's mother than he had set the blaze." *See* Exhibit C.

[4] Defendant did not file a motion to <u>suppress</u> on the ground that the identification procedure was impermissibly suggestive, because no "identification" was made. Nonetheless, her uncertain statements should be excluded as unfairly prejudicial. *See* Fed. R. Evid. 403.

testimony to <u>this</u> particular case.  Accordingly, it is both irrelevant and, at least in part, a violation of Rule 702.

Unless the government can show why it is probable that a fingerprint was not left on this particular bottle, Wanagle's testimony is simply not relevant to the case.  *See* Fed. R. Evid. 401 (to be relevant, evidence must make existence of consequential fact "more probable or less probable").  Here, the government does not seek to tie Wanagle's testimony to the facts of this case.  *Compare United States v. Carpenter*, 403 F.3d 9, 10 n.1 (1st Cir. 2005) (government adduced expert testimony that it is "exceedingly difficult to lift viable fingerprints form the surfaces of this <u>particular weapon</u>") (emphasis added).  As such, Wanagel's generalized testimony is not relevant and should be excluded.

Moreover, to the extent that Wanagel intends to testify that fingerprints can be "wiped off or smudged" and that "physical barriers, such as gloves, can prevent the transfer of prints from the fingers" (*see* Exhibit B at 7), such testimony is improper under Rule 702.  *See United States v. Booth*, 669 F.2d 1231, 1240 (9th Cir. 1982).  In *Booth,* the government tried to adduce expert testimony that the reason no fingerprints were left on a car was because the occupants had either used gloves or wiped fingerprints from the vehicle.  The district court ruled that the expert could not so testify.  The appellate court affirmed this ruling under Rule 702, holding that the "trier of fact is capable of inferring why no fingerprints were found without the assistance of expert testimony."  The exact same reasoning applies here, and Wanagel's proposed testimony as detailed herein should be excluded.

**F.      Alleged Hearsay Statements of Lisa Jackson**

According to government witnesses Drayton and Brown, after the altercation that occurred the night prior to the fire, Jackson yelled to them words to the effect of "my boyfriend will kill you," and "my boyfriend will fire you out." These statements are inadmissible hearsay under Rule 802. Because none of the exceptions to the hearsay rule apply, these alleged statements should be excluded.

**G.      Alleged Crack Pipe Claimed to have been Found on Defendant During his Arrest**

According to the government, defendant had a crack pipe in his possession when he was arrested. The government has indicated that it does not currently intend to adduce evidence regarding the alleged crack pipe in its case in chief. Nonetheless, in the event the government decides to reverse course, defendant seeks an order from the Court excluding any evidence regarding the alleged crack pipe, as it is clearly irrelevant to the case and extremely prejudicial. *See* Fed. R. Evid. 403.

**H.      Defendant's Prior Convictions**

Should defendant testify at trial, the Court should exclude all evidence of his prior convictions. *See* Fed. R. Evid 609. According to the information provided to defendant by the government, defendant has been convicted of credit card misuse (date of offense, 12/19/99); robbery, larceny from a building and trespassing (2/3/00); trespassing and larceny (4/20/00); trespassing (10/20/00); possession of a Class D controlled substance (11/17/00); knowingly receiving stolen property (11/7/01); possession of a hypodermic needle or syringe (10/22/02); and possession of burglarious tools (8/5/03). All of these convictions stemmed from proceedings in Massachusetts state district courts.

"[I]n virtually every case in which prior convictions are used to impeach the testifying defendant, the defendant faces a unique risk of prejudice – *i.e.,* the danger that convictions that would be excluded under Fed. R. Evid. 404 will be misused by a jury as propensity evidence despite their introduction solely for impeachment purposes." *See* Advisory Committee Notes to Fed. R. Evid 609. The government bears the burden of demonstrating that the probative value of defendant's prior convictions for purposes of impeachment outweighs their prejudicial effect. "Although the rule does not forbid all use of convictions to impeach the defendant, it requires that the government show that the probative value of convictions as impeachment evidence outweighs their prejudicial effect." *Id.*

Here, with the arguable exception of defendant's conviction for credit card misuse, none of his convictions involve "dishonesty or false statements." *See* Fed. R. Evid. 609(a)(2).[5] There is simply no probative value in allowing evidence of these prior convictions to impeach defendant in this case. Yet, as explicitly recognized by the Advisory Committee, allowing this evidence will cause defendant to "face[] a unique risk of prejudice." Accordingly, the Court should exclude such evidence under Rule 609.

---

[5] To the extent that the Court believes evidence of the credit card misuse conviction should be admissible under Rule 609(a)(2) as involving dishonesty or a false statement, the Rule 609 evidence should be limited to just that one conviction.

**III.**    **CONCLUSION**

For the foregoing reasons, all of the above categories of evidence (both by way of

exhibits and testimony, during cross or direct examination) should be excluded.

Respectfully submitted,

ROBERT WYATT
By his attorneys,


/s/ Douglas S. Brooks
Paul V. Kelly (BBO No. 267010)
Douglas S. Brooks (BBO No. 636697)
KELLY, LIBBY & HOOPES, P.C.
175 Federal Street
Boston, MA  02110
(617) 338-9300


Dated:  February 27, 2006


**CERTIFICATE OF SERVICE**

I, Douglas S. Brooks, hereby certify that this document filed through the ECF
system will be sent electronically to the registered participants as identified on the Notice
of Electronic filing (NEF) and paper copies will be sent to those indicated as non-
registered participants on this 27th day of February, 2006.


/s/ Douglas S. Brooks
Douglas S. Brooks

# EXHIBIT
# A

## AFFIDAVIT

I, Mattheu Kelsch, having been duly sworn, on oath depose and state as follows:

1. I am a Special Agent assigned to the Boston Field Office of the U.S. Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have been so employed since 2001. As an ATF Special Agent, I am responsible, among other things, for conducting investigations relating to the violation of federal firearms, arson, and explosives laws, and have participated in numerous arson investigations.

2. I am aware based on my training and experience that Title 18, United States Code, Section 844(i) makes it a federal offense for anyone to maliciously damage or destroy, or attempt to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce. I further know that, pursuant to Title 18, United states Code, Section 924(c), it is a federal offense to use or carry during or in relation to, or to possess in furtherance of, a federal crime of violence (such as arson), a firearm, including an incendiary device that qualifies as a destructive device. Have so stated, I make this affidavit in support of a complaint charging an individual named Robert L. Wyatt ("Wyatt") with arson, in violation of 18 U.S.C. §§ 844(i) and 2; and with using and carrying during and in relation to, and

possession in furtherance of, a crime of violence, to wit, arson,
a firearm, to wit, an incendiary device known as a Molotov
Cocktail.

3.  The statements contained in this affidavit are based on
my own investigation and on information provided to me by other
ATF agents and local and state police and fire officials.  In
submitting this affidavit, however, I have not included each and
every fact known to me about the investigation, but instead only
those facts that I believe are sufficient to establish probable
cause to believe that Wyatt has committed the offenses specified.

4.  I and others have been involved in an ongoing
investigation of an incendiary fire that occurred on November 14,
2004 at 264 Putnam Avenue, Cambridge, Massachusetts, a
residential apartment complex comprising eight rental units and
approximately thirty occupants (the "Building").

5.  At approximately 4:32 a.m. on Sunday, November 14, 2004,
the Cambridge Fire Department responded to a fire at the
Building.  An investigation into the origin and cause of the fire
determined that it was incendiary, that is, that is was set
intentionally.  Of particular significance, among other things,
was the discovery in the back yard of the Building, at the time
that fire suppression efforts were under way, of an intact device
known colloquially as a "Molotov Cocktail."  The Molotov cocktail
consisted of a clear glass pint bottle labeled "Smirnoff Ice,"

2

which contained an ignitable liquid and which had an improvised cloth wick.

6. The origin and cause investigation also revealed that the fire started in Apartment 2 within the Building, which was occupied at the time by Christine Brown ("Brown"), Norman Drayton ("Drayton"), and their ten-month-old son. Brown and Drayton had been involved in an altercation the previous night with an individual named Lisa Jackson ("Jackson"). According to Brown, in substance and among other things, she had encountered Jackson the previous night at a local bar. As Brown was leaving the bar, Jackson asked to use her telephone. Jackson accompanied Brown to Brown's apartment in the Building, where Drayton and the baby were attempting to sleep. According to both Brown and Drayton, in substance and among other things, Jackson was sufficiently loud while in the apartment that Drayton entered the kitchen. Jackson became upset when told she would have to leave, and a physical altercation ensued involving Jackson, Brown, and Drayton. Jackson was forced out of the apartment. Both Drayton, from a telephone in the apartment, and Brown, from an outside pay phone, called 911, and the police responded. The police spoke to the parties but took no further action. Jackson thereafter returned to the apartment and kicked at the door, yelling words to the effect of, "My boyfriend will kill you" and "My boyfriend will fire you out." Jackson ultimately tired and left the area.

3

7.   The following day, Isabelle Jackson, the mother of Jackson, learned that Jackson had been involved in a physical altercation.  That night Isabelle Jackson went out, returning to her apartment at 808 Memorial Avenue, Cambridge, Massachusetts, at around 2:46 a.m. on November 14, 2004.  This building is a four-minute walk from the Building.  Upon returning home, Isabelle Jackson learned that Jackson's boyfriend, Wyatt, who sometimes stayed with Jackson and Isabelle Jackson, was in her apartment.  Isabelle Jackson asked Wyatt to move her car into the apartment parking lot for her.  Wyatt agreed to do so, and Isabelle Jackson went to sleep.

8.   Among other things, video footage from the video surveillance system located at 808 Memorial Drive depicts Wyatt, wearing a multi-colored Nike jacket, leaving the building through a fire escape door and then reentering the building through the front door with Isabelle Jackson at approximately 2:48 a.m., at the time that he was moving the car.  Further footage depicts an individual who appears to be Wyatt leaving 808 Memorial Drive through the fire escape door at approximately 4:15 a.m. wearing a dark, hooded jacket and carrying a bag containing objects consistent in size and shape with bottles.  Further footage depicts Wyatt reentering 808 Memorial Drive through the fire exit door at around 4:36 a.m., no longer carrying the bag with the objects.  Again, the Cambridge Fire Department responded to the

4

fire at the Building at approximately 4:32 a.m.

9. Isabelle Jackson has told investigators, in substance and among other things, that she awoke that morning at approximately 4:30 a.m. when she heard Wyatt entering the apartment. Among other things, she asked Wyatt where he had been, and he responded, in substance, that he had "set the house on fire," indicating that he was speaking of the building involved in the altercation of the previous night. Wyatt also told Isabelle Jackson, in substance and among other things, that he had thrown two or three bottles into the house, and that she would hear fire engines shortly.

10. Isabelle Jackson has further told investigators, in substance and among other things, that she regularly drinks Smirnoff Ice alcoholic beverages, and that two or three empty Smirnoff Ice bottles were missing from her porch after the fire. Isabelle Jackson also has told investigators that, after the fire, she noticed that one of her dishtowels had been cut up.

11. At the time of the fire, Brown was sleeping in the living room with her ten-month-old son, and Drayton was sleeping in the bedroom. Both awoke to loud noises and the sound of breaking glass, which proved to be a rear window of their apartment breaking. Both observed fire spreading quickly throughout the living room. Drayton observed what appeared to be a burning clear glass bottle with a white rag stuck in the neck,

5

which he believed to be a Molotov Cocktail. Drayton made efforts to put the fire out but was persuaded by another tenant to get out of the Building. Before the Fire Department succeeded in extinguishing the fire it caused extensive damage to the Building. All of the tenants were evacuated, and none have yet been able to reoccupy the Building.

12. I have consulted with ATF Explosives Enforcement Officer Howard House, an expert in destructive devices, who has informed me that, based on the characteristics of the Molotov Cocktail recovered from the back yard of the Building, it is a "destructive device" within the meaning of 18 U.S.C. § 921(a)(4) and therefore is a "firearm" within the meaning of 18 U.S.C. § 921(a)(3).

13. Based on the foregoing, I have probable cause to believe that, on or about November 14, 2004, Robert L. Wyatt did maliciously damage and attempt to damage by means of fire real property used in an activity affecting interstate commerce, to wit, premises known as 264 Putnam Avenue, Cambridge, Massachusetts, in violation of 18 U.S.C. § 844(i); and further that Robert L. Wyatt did use and carry during and in relation to, and did possess in furtherance of, a crime of violence, to wit, arson, a firearm, to wit, an incendiary device known as a Molotov

Cocktail, in violation of 18 U.S.C. § 924(c).

MATTHEU KELSCH
Special Agent, ATF

Subscribed and sworn to before me this ⟋ Day of ~~November,~~ December 1
2004.

~~JOYCE LONDON ALEXANDER~~ Laurence P. Cohe
United States Magistrate Judge

7

# EXHIBIT B



**U.S. Department of Justice**

*United States Attorney*
*District of Massachusetts*

---

*Main Reception: (617) 748-3100*

*United States Courthouse, Suite 9200*
*1 Courthouse Way*
*Boston, Massachusetts 02210*

February 6, 2006

**BY HAND**

Douglas S. Brooks, Esq.
Kelly, Libby & Hoopes
175 Federal Street
Boston, MA 02110

     Re:  United States v. Robert L Wyatt
          <u>Criminal No. 04-10391-NMG</u>

Dear Mr. Brooks:

    The following summarizes the expert testimony that, absent stipulation, the government currently anticipates adducing on its case-in-chief:

<u>Massachusetts State Trooper Donald Bossi</u>

    Trooper Bossi, whose qualifications are enclosed, will testify to the substance of the report previously provided.[1] Trooper Bossi will testify regarding the observations he made at 264 Putnam Street on November 14, 2004 and the information he received from others, including Lieutenant Brian Higgins of the Cambridge Fire Department. Trooper Bossi will testify to the observations he made and the basis for his conclusion that the apartment of origin of the fire was apartment two, and, within apartment two, the living room. Trooper Bossi will testify regarding the damage that he observed in that room and in other areas of the apartment and building. Trooper Bossi will testify regarding the training of A-K9 Tubbs, including specifically how Tubbs has been trained to detect accelerants/ignitable liquids. Trooper Bossi will testify that A-K9 Tubbs was deployed at 264

---

    [1]Trooper Bossi may testify as a fact witness regarding other aspects of the investigaiton.

Putnam Street; that Tubbs alerted to the bottle and wick that
Lieutenant Higgins had located outside the building; and that
Tubbs also alerted three times in the living room of apartment
two.  Trooper Bossi will testify regarding the manner and
significance of alerts by Tubbs.  Trooper Bossi will testify
regarding the manner in which evidence from these locations and
from the bottle was collected and marked for analysis.

Trooper Bossi will testify that, based on his examination of
the scene and the evidence gathered, it is Trooper Bossi's
opinion that the fire originated in the living room in front of a
window located along a wall denominated C closest to a corner
denominated B.  Trooper Bossi will testify that he examined this
area for potential heat sources and located none.  Trooper Bossi
will testify that, given the absence of a heat source that could
account for the fire, the extent of "low burn," and the other
information available to him, it is his opinion that the fire was
not accidental but instead was incendiary.  Based on the
examination of the scene, the evidence collected at the scene,
including the bottle recovered outside the building with a wick
and containing a liquid, the results of laboratory analysis,
including the identification of the liquid from the bottle as
gasoline and the identification of gasoline residue from another
sample, and witness statements, including the statements of
Christine Brown and Norman Drayton regarding their observations
inside the apartment, it is Trooper Bossi's opinion that the fire
was initiated by throwing a lit "Molotov cocktail" through the C
side window of apartment two into the living room of apartment
two.

Cambridge Fire Lieutenant Brian Higgins

Lieutenant Higgins, whose qualifications are enclosed, will
testify to the substance of the report previously provided.[2]
Lieutenant Higgins will testify that, upon arrival at 264 Putnam
Avenue, he learned that heavy fire was showing on the first floor
of the sides of the building denominated B and C.  Lieutenant
Higgins will describe the building and his observations after he
arrived at the scene.  Lieutenant Higgins will testify that he
saw heavy charring from fire on the B side of the building that
had vented from the first-floor window closest to the C side.
Lieutenant Higgins will testify that he observed heavy charring
from a rear apartment doorway and a window on the C side of the
building.  Lieutenant Higgins will testify that the fire had

---

[2]Lieutenant Higgins may testify as a fact witness regarding
other aspects of the investigation.

2

burned with such intensity from the inside of apartment two that
the fire had vented the door and window burning up and out,
causing overlapping fire to begin to burn the exterior of the
building and causing heavy charring around the second-floor
windows.

Lieutenant Higgins will testify that, as he was standing on
the C side of the building opposite the doorway and window, he
detected a strong odor of what he believed to be gasoline.  Fire
suppression efforts were still underway and, as the Rescue
Company began to throw a ladder in Lieutenant Higgins's
direction, he observed at his feet a clear glass bottle with a
rag hanging out the top.  Lieutenant Higgins will describe the
bottle and testify that it contained a liquid having an odor
similar to gasoline.  Lieutenant Higgins will testify that he
halted firefighting operations in the area, covered the bottle
with a barrel, and had the area taped off.  Lieutenant Higgins
will testify that he contacted State Trooper Donald Bossi and
requested that he respond with his A-K9 Tubbs.  Lieutenant
Higgins will testify that he observed Tubbs alert on the wick of
the bottle the surrounding soil.  Lieutenant Higgins will testify
regarding the recovery of the bottle, evidence from the bottle,
and other samples taken outside and inside the building.

Lieutenant Higgins will testify regarding his examination of
the interior of apartment two on the first floor.  Lieutenant
Higgins will testify that he used the "backward theory" of
examination, proceeding from the area of least damage to the area
of the greatest damage.  Lieutenant Higgins will testify that he
determined the area of origin of the fire to be the living room
on the C side of the building.  Lieutenant Higgins will testify
that he entered this room during firefighting operations and, at
that time, smelled a strong odor of what he believed to be
gasoline and observed, among other things, that there were small
spot fires in multiple parts of the room.  Lieutenant Higgins
will testify regarding the significance of these observations.
Lieutenant Higgins will testify that, based on these
observations, together with heavy charring that he observed and
the fact that the fire was fast-moving, it was his opinion that
an ignitable liquid had been thrown, splashed, or splattered
throughout the living room.  Lieutenant Higgins will testify that
he determined the heaviest damage to be concentrated
approximately three to five feet off the interior C wall opposite
the window, which Lieutenant Higgins observed to have heavy
interior charring around the sill that burned up and out of the
window.  Lieutenant Higgins will testify that, based on
information from Norman Drayton that he had observed the neck of
a broken bottle with a wick hanging out of it as he was trying to

3

suppress the fire, Lieutenant Higgins systematically cleaned the floor but was unable to recover the broken bottle and wick. Lieutenant Higgins will testify that he could not locate a competent heat source at the point of origin and based on this, together with the other factors, it is Lieutenant Higgins's opinion that the fire was not accidental but instead was incendiary.

Based on the examination of the scene, the evidence collected at the scene, including the bottle recovered outside the building with a wick and containing a liquid, the results of laboratory analysis, including the identification of the liquid from the bottle as gasoline and the identification of gasoline residue from another sample, and witness statements, including the statements of Christine Brown and Norman Drayton regarding their observations inside the apartment, and statements of the firefighters describing the heat, flame height, and speed of fire spread, and after eliminating all accidental heat sources, it is Lieutenant Higgins's opinion that the fire was incendiary. Lieutenant Higgins will testify that persons who set fires intentionally often use ignitable liquids to increase the speed and intensity of the fire. Lieutenant Higgins will testify that, based on all the information available to him, it is his opinion that a "Molotov cocktail" containing an ignitable liquid and a wick was lit and thrown into the living room window of apartment two through the C side of the building, and that more than one such "Molotov cocktail" was used.

Chemist John Drugan

Chemist John Drugan of the Massachusetts State Police Crime Laboratory, whose qualifications are enclosed, will testify regarding his chemical analysis of the content of six samples – Items 1-6 – recovered from the scene of the fire. Chemist Drugan will describe the process whereby the evidence was submitted to the Laboratory and how the evidence was processed once it was received. Chemist Drugan will testify that with respect to each of the items, he opened the particular item and first smelled the contents. In the case of both Item 1 and Item 6, he detected an odor similar to gasoline; he detected no such odor with respect to the other four items.

With respect to each item, Chemist Drugan next inserted D-Flex and heated up the sample to 90° Centigrade and left it overnight. Chemist Drugan will describe D-Flex and explain that ignitable liquids will vaporize and be captured by the charcoal strip component of the D-Flex.

4

Chemist Drugan will testify that, with respect to each item, he next took the charcoal strip component and placed it in a vial.  He then added a solvent – carbon disulfide – to extract anything that had been trapped on the charcoal strip.  The vials were then shaken and a portion of the liquid was put in a smaller vial.

Chemist Drugan will testify that the vial was then put on a gas chromatograph with a flame ionization detector, or "GCFID". Chemist Drugan will describe how the equipment works. Chemist Drugan will testify that, when the sample was run, a data page is printed out.  If this page showed a flat line, nothing further was done.  If the page showed any peaks, Chemist Drugan used a gas chromatograph with a mass spectrometer, or "GC-MS". Chemist Drugan will describe how this equipment works.  This equipment also generates a print-out with a series of peaks based on the compounds present in various flammable liquids.  Chemist Drugan will testify that different sorts of flammable liquids can be identified based on the peaks present in a particular case. In the case of Item 1, Chemist Drugan identified the presence of a gasoline residue.  In the case of Item 6, Chemist Drugan identified the liquid as gasoline.  In the case of each of the other items, Chemist Drugan detected no ignitable liquids.

Chemist Drugan will testify regarding the negative and positive controls that were employed in performing his analysis.

Chemist Drugan will testify regarding how the evidence was handled after his analysis was completed.

EEO Howard R. House

Explosives Enforcement Officer Howard R. House of ATF will testify regarding his opinion that materials involved in this case are/were improvised incendiary bombs and thus destructive devices within the meaning of 26 U.S.C. § 5845(f).  EEO House will testify that he reviewed a report dated November 18, 2004, the laboratory report, and physical evidence, including the bottle, wick, and evidence regarding the liquid recovered from the bottle, and how those materials were assembled when found. EEO House will testify that the improvised incendiary device commonly known as a "Molotov cocktail" is typically designed using a glass container containing a quantity of flammable liquid and a wick.  EEO House will testify that devices of this type are designed to produce and support fire by the aeration and ignition of flammable liquid.  EEO House will testify that the device is so designed that when one lights the wick and then throws the device, the glass container breaks, enabling the flammable liquid

5

inside to escape and the vapors to ignite.  EEO House will
testify that the resultant heat and flame then spread fire to
other combustible materials.   EEO House will testify that the
Smirnoff Ice bottle with the wick fashioned from absorbent cloth
material and containing gasoline that was located outside 264
Putnam Street is a "Molotov cocktail" and, as such, is an
improvised incendiary bomb that meets the definition of
destructive device as defined at 26 U.S.C. § 5845(f).  EEO House
will further testify that the evidence from the scene of the fire
and witness statements is consistent with the actual use of a
similar "Molotov cocktail," which was lit and thrown into the
building, causing the container to break, the gasoline inside to
escape, the vapors to ignite, and the resultant fire to spread to
other combustible material in the apartment, causing extensive
property damage and potential injury or death to persons in
proximity to the fire.

## Massachusetts State Trooper Wesley Wanagel

     Trooper Wanagel will testify that he processed the Smirnoff
Ice bottle recovered from the scene of the fire for the presence
of latent fingerprints.  Trooper Wanagel will provide background
testimony regarding fingerprints, the recovery of latent
fingerprints, and fingerprint comparison.  Trooper Wanagael will
explain how a latent fingerprint is left on an object and that
the act of touching an object will not necessarily leave a
fingerprint on the object.  Trooper Wanagel will testify that, in
processing the above-mentioned object for latent fingerprints, he
used the Cyanoacrylate Fuming Method ("CFM") and a contrasting
powder.  Trooper Wanagael will describe the CFM and how the
process causes the cyanoacrylate, commonly known as "Super Glue,"
to adhere to latent fingerprints or latent ridge detail on an
object and how such fingerprints or detail can be rendered more
visible with the application of contrasting powder.

     Trooper Wanagel will testify that, in this case, he examined
the bottle so processed with and without an alternate light, and
will explain the significance of so doing.  Trooper Wanagel will
testify that no latent fingerprints were detected.

     Trooper Wanagel will testify to examples of various factors
that can lead to such a result, including but not limited to the
fact that fingerprints are very fragile; the fact that a
fingerprint is not necessarily left at all when a person touches
an object, for a variety of reasons, including environmental
and/or physiological factors that can result in the individual in
question not sweating or otherwise not having the ingredients
necessary for fingerprints on his fingers at the time in

6

question; the fact that, even if a print or ridge detail is left on the surface of an object, it can be wiped off or smudged thereafter if the item comes in contact with clothing or some similar surface; and the fact that physical barriers, such as gloves, can prevent the transfer of prints from the fingers to the surface in question.

Please call the undersigned Assistant U.S. Attorney at 617-748-3247 if you have any questions.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:

ROBERT E. RICHARDSON
Assistant U.S. Attorney

Enclosures

7

# EXHIBIT C



# Feds hold man in firebombing of building

By J.M. Lawrence
*Tuesday, December 7, 2004*

**A**n ex-con bent on hurting a woman who tangled with his girlfriend set fire to a Cambridge apartment building last month with Molotov cocktails, leaving more than a dozen people homeless, according to local and federal investigators.

Robert L. Wyatt, 40, of Cambridge remains held without bail and could face decades in federal prison for a Nov. 14 early morning blaze at 264 Putnam Ave. that injured a Cambridge firefighter.

Investigators said they have video surveillance on the day of the fire of Wyatt leaving his girlfriend's nearby apartment on Memorial Drive carrying the homemade fire bombs about 4:15 a.m. and re-entering about 4:36 a.m. The blaze broke out about 4:30 a.m.

Wyatt, busted in a joint effort of the Cambridge Fire Investigations Unit, federal Bureau of Alcohol, Tobacco and Firearms, Cambridge police and state fire marshal's office, also allegedly confessed to his girlfriend's mother that he had set the blaze.

Investigators believe he used the mother's discarded liquor bottles and a ripped-up dish towel for the wicks.

Before the fire, Wyatt's girlfriend, Lisa Jackson, had feuded with a resident of the Putnam Avenue building named Christine Brown.

The two women had met at a bar that night and Brown allowed Jackson into her home to use the phone. But Brown later threw Jackson out.

Brown claims an angry Jackson soon returned screaming, ``My boyfriend will kill you'' and ``My boyfriend will fire you out,'' according to an affidavit filed in federal court.

If convicted of using a Molotov cocktail, Wyatt faces a minimum mandatory sentence of 30 years in prison.

## HERALD INTERACTIVE *TOOLS*

XML Get RSS Feed

Post Comments in Forum

View Graphic Version

Email to a Friend

Subscribe to the Boston Herald

### RELATED LOCAL *NEWS*

Cape cops charge kids with setting 2 car fires

Cape juveniles apprehended for car fires

Families forced to flee as blaze guts dwelling

Rapist escapes 20 minutes before jury's guilty verdict

Pro-abort vandals suspected in church desecration

### RELATED OPINION *NEWS*

There's no point in rushing

## Boston Herald TalkBack

**Latest posts:**
by **FinancialVampire**
Good one SSB! How about Foolish Sad Unics (no balls)? Maybe Fragile, Small Units? Why they'd want to advertise that I dont understand...... more

» Re:website for alexand...
» Re:fsu...
» Re:the big digsaster...
» Re:fsu...

post :: view :: join

[ contact us ] :: [ print advertising ] :: [ online advertising ] :: [ FAQ's ] :: [ News Tips ] :: [ Electronic Edition ] :: [ Browser Up

**Click here for home delivery** or call 1.800.882.1211 for **Back Issues** call 617.619.6523

© Copyright by the Boston Herald and Herald Interactive Advertising Systems, Inc.
No portion of BostonHerald.com or its content may be reproduced without the owner's written permission. Privacy Commitment

Enterprise-level broadband service provided by
**Intellispace: A Better Breed of Broadband**



Wireless broadb
provided by **Tov**