```
                    UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS
```

**UNITED STATES OF AMERICA** )
                             )
    v.                       )   CRIMINAL NO. 04-10391-NMG
                             )
**ROBERT WYATT**             )

<u>**GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION IN LIMINE**</u>

The government respectfully submits herewith its opposition to the defendant's motion in limine, in which the defendant seeks rulings precluding certain evidence at the trial of this case.

<u>**BACKGROUND**</u>

At approximately 4:32 a.m. on Sunday, November 14, 2004, the Cambridge Fire Department responded to a fire at 264 Putnam Avenue, Cambridge, Massachusetts (the "Building"). An investigation into the origin and cause of the fire determined that it was incendiary, that is, that is was set intentionally. Of particular significance, among other things, was the discovery in the back yard of the Building, at the time that fire suppression efforts were under way, of an intact device known colloquially as a "Molotov cocktail." The Molotov cocktail consisted of a clear glass pint bottle labeled "Smirnoff Ice," which contained an ignitable liquid and which had an improvised cloth wick.

The origin and cause investigation also revealed that the fire started in Apartment 2 within the Building, which was occupied at the time by Christine Brown ("Brown"), Norman Drayton

("Drayton"), and their ten-month-old son. Brown and Drayton had been involved in an altercation the previous night with an individual named Lisa Jackson ("Jackson"), who was then the girlfriend of the defendant. Brown had encountered Jackson the previous night at a local bar. Jackson later followed Brown to Brown's apartment in the Building, where Drayton and the baby were attempting to sleep, and asked to use the telephone. Jackson was sufficiently loud while in the apartment that Drayton entered the kitchen. Jackson became upset when told she would have to leave, and a physical altercation ensued involving Jackson, Brown, and Drayton. Jackson was forced out of the apartment. Both Drayton, from a telephone in the apartment, and Brown, from an outside pay phone, called 911, and the police responded. The police spoke to the parties but took no further action. Jackson thereafter returned to the apartment and kicked at the door, yelling words to the effect of, "My boyfriend will kill you" and "My boyfriend will fire you out." Jackson ultimately tired and left the area.

    The following day, Isabelle Jackson, the mother of Jackson, learned that Jackson had been involved in a physical altercation. That night Isabelle Jackson went out, returning to her apartment at 808 Memorial Avenue, Cambridge, Massachusetts, at around 2:46 a.m. on November 14, 2004. This building is a four-minute walk from the Building. Upon returning home, Isabelle Jackson learned

that the defendant, who sometimes stayed with Jackson and Isabelle Jackson, was in her apartment. Isabelle Jackson asked the defendant to move her car into the apartment parking lot for her. The defendant agreed to do so, and Isabelle Jackson went to sleep.

Video footage from the video surveillance system located at 808 Memorial Drive depicts the defendant, wearing a multi-colored Nike jacket, leaving the building through a fire escape door and then reentering the building through the front door with Isabelle Jackson at approximately 2:48 a.m., at the time that he was moving the car. Further footage depicts an individual consistent in appearance with the defendant leaving 808 Memorial Drive through the fire escape door at approximately 4:15 a.m. wearing a dark, hooded jacket and carrying a bag containing objects consistent in size and shape with bottles. Further footage depicts this individual reentering 808 Memorial Drive through the fire exit door at around 4:36 a.m., no longer carrying the bag with the objects. (Again, the Cambridge Fire Department responded to the fire at the Building at approximately 4:32 a.m.)

Isabelle Jackson was awakened that morning at approximately 4:30 a.m. when she heard the defendant entering the apartment. Among other things, she asked the defendant where he had been, and he responded, in substance, that he had "set the house on fire," referring to the building involved in the altercation of

3

the previous night. The defendant also told Isabelle Jackson, in substance and among other things, that he had thrown two or three bottles into the house, and that she would hear fire engines shortly.

Isabelle Jackson regularly drinks Smirnoff Ice alcoholic beverages. Two or three empty Smirnoff Ice bottles proved to be missing from her porch after the fire. Isabelle Jackson also noticed after the fire that one of her dishtowels had been cut up. The improvised cloth wick found in the intact Molotov cocktail is consistent with the Isabelle Jackson's dishtowels.

At the time of the fire, Brown was sleeping in the living room with her ten-month-old son, and Drayton was sleeping in the bedroom. Both awoke to loud noises and the sound of breaking glass, which proved to be a rear window of their apartment breaking. Both observed fire spreading quickly throughout the living room. Drayton observed what appeared to be a broken bottle with a burning rag stuck in the neck, which he believed to be a Molotov cocktail. Drayton made efforts to put the fire out but was persuaded by another tenant to get out of the Building. Before the Fire Department succeeded in extinguishing the fire it caused extensive damage to the Building. All of the tenants had to be evacuated.

A fingerprint expert with the Massachusetts State Police was unsuccessful in his attempt to develop latent fingerprints on the

4

Molotov cocktail found outside the Building.

A chemist with the Massachusetts State Police determined that liquid recovered from the intact Molotov cocktail is gasoline, and that soil recovered from the area where the Molotov cocktail was lying contains gasoline residue. (The chemist also determined that three samples from inside the Brown apartment, in locations where an accelerant-sniffing dog had alerted, contained no detectable ignitible liquids.)

An ATF Explosives Enforcement Officer who is an expert in destructive devices determined that the Molotov cocktail recovered from the back yard of the Building, and the one apparently used to start the fire, are "destructive devices" within the meaning of 18 U.S.C. § 921(a)(4) and therefore are "firearms" within the meaning of 18 U.S.C. § 921(a)(3). Such a device is so designed that when one lights the wick and then throws the device, the glass container breaks, enabling the flammable liquid inside to escape and the vapors to ignite.

Two experts in the origin and cause of fires have opined that the fire was started with the use of at least one Molotov cocktail, as set forth more fully below.

## ARGUMENT

**Expert Testimony Regarding Cause of Fire**

The defendant seeks to exclude expert testimony regarding th origin and cause of the fire in the Building. For the reasons

5

that follow, this motion should be denied.

Two experts in the origin and cause of fires - Cambridge Fire Department Lieutenant Brian Higgins, and Massachusetts State Trooper Donald Bossi of the State Fire Marshal's Office - have opined that the fire started just inside the broken window in Christine Brown's apartment through the introduction of ignitable liquid contained in at least one Molotov cocktail.  These opinions are based on a number of factors.  Lieutenant Higgins, for example, was present during fire suppression operations and, while the fire was still in progress, detected a strong odor of gasoline in the Brown living room, observed spot fires, and observed evidence of heavy charring and a fast-moving fire, all factors leading Lieutenant Higgins to conclude that an ignitible liquid had been thrown, splashed, or splattered in the living room.

Lieutenant Higgins also located behind the Building, near the broken window into the Brown apartment, an intact Molotov cocktail, albeit one that was lying on its side on an area of soil that smelled of gasoline.  Lieutenant Higgins protected the device with an overturned barrel while the fire was being fought, and later recovered it.  The liquid remaining in the Molotov cocktail after the fire was suppressed proved to be gasoline, and soil taken from the area where the device was found tested positive for the presence of a gasoline residue, a circumstance

consistent with some of the liquid in the bottle having leaked out.

Lieutenant Higgins also had available witness accounts, both regarding the speed and intensity of the fire, and regarding the observation by Norman Drayton of a bottle neck with a burning wick inside the apartment immediately after the fire started. Lieutenant Higgins also knew of the defendant's admissions to Isabelle Jackson as to starting the fire by throwing bottles into the house.

The defendant's argument in favor of excluding the expert origin and cause evidence is that it will not assist the trier of fact because it purportedly entails inferences that the jury can draw as readily as the experts. Indeed, the defendant maintains that the expert testimony contradicts the government's own scientific evidence, because samples collected from inside the apartment did not test positive for gasoline and because investigators were unable to locate broken pieces of a Molotov cocktail inside the apartment after the fire had been suppressed. The defendant contends that, therefore, the opinions appear to be based simply on Norman Drayton's observations, which the defendant claims are insufficiently reliable, and the discovery of an intact Molotov cocktail outside the Building.

The government agrees that, to be admissible, expert testimony must help the jury to understand evidence based on the

training and experience of the expert.  See, e.g., United States v. Sebaqqlia, 256 F.3d 59, 65-66 (1st Cir. 2001).  The trial court enjoys considerable latitude in determining whether particular expert evidence would so assist the jury.  Id., citing United States v. Ladd, 885 F.2d 954, 959 (1st Cir. 1989); United States v. Wilson, 798 F.2d 509, 517 (1st Cir. 1986).  That latitude plainly should be exercised in this case in favor of admission of the evidence.

First, the opinions do not, as the defendant claims, boil down to Norman Drayton's observations and the discovery of the Molotov cocktail outside the Building.  Rather, independent observations of Lieutenant Higgins regarding multiple areas of fire in the Brown livingroom, and evidence regarding the speed of the fire and the charring patterns, all are indicative of an incendiary fire in which an ignitible liquid was used as an accelerant.  Gasoline is an ignitible liquid, and a Molotov cocktail is an ideal vehicle for introducing from a remote location both the liquid accelerant and the open flame for igniting it.

Second, an expert properly may rely on witness statements in arriving at an opinion.  Rule 703 provides, inter alia, that, "[i]f of a type reasonably relied on by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the

opinion or inference to be admitted." At least one court has opined that this Rule is, in effect, another exception to the rule against hearsay. See United States v. Skodnek, 896 F. Supp. 60, 66 (D. Mass. 1995)(Gertner, J.); see also, e.g., Ford v. Nationwide Mut. Fire Ins. Co., 62 Fed.Appx. 6 (1st Cir. 2003)(unpublished)(accident reconstruction expert can rely in part on deposition testimony of driver). It should not be a surprise that origin and cause experts, like other experts, routinely and properly consider observations of witnesses in deriving their opinions.[1]

Indeed, the defendant does not dispute that experts properly may consider witness statements. See Def. Mem. At 5. Rather, the defendant claims that such statements must be reliable, and the experts here are not in a position to judge the reliability of Norman Drayton's observations. But the Drayton statements do not exist in a vacuum; instead, significant corroboration exists. Such corroboration includes the discovery of a Molotov cocktail outside the Building; the fact that the fire started immediately after the window to the Brown apartment was broken; the defendant's admissions to Isabelle Jackson regarding setting the fire and his mode of setting it; the defendant's ready access in Isabelle Jackson's apartment the night of the fire to components

---

[1] Norman Drayton is expected to be a witness, so the government anticipates that the jury will hear his observations directly.

9

found in the intact Molotov cocktail (the Smirnoff bottle and the cloth wick); and, as noted above, the observations made at the scene of the fire that are consistent with the introduction of an ignitible liquid such as gasoline.

The defendant also contends that the expert origin and cause opinions run afoul of Fed. R. Evid. 403, because they will permit the government to put an expert "stamp of approval" on evidence that the jury can access as readily as the experts. Def. Mem. At 5-7. But, as shown above, this argument rests on a faulty premise, namely, that the experts here add nothing to the jury's understanding of the evidence. Jurors have no innate expertise regarding fires in general or the tell-tale evidence of accelerants in particular. Here, as noted previously, the speed at which the fire spread, the damage that it caused, and other factors are consistent with the introduction of an accelerant. The totality of the available evidence leads the experts to conclude that the mode of introduction of the accelerant was a Molotov cocktail. Given that these opinions are based on expertise well beyond the ken of the ordinary juror, they do not run afoul of Rule 403 and should be admitted.

**Evidence of the Intact Molotov Cocktail**

The defendant also contends that the Molotov cocktail found outside the Building should be excluded under Rule 403 because there is insufficient evidence linking it to the fire. The

defendant, however, is incorrect: in fact, the evidence linking the device both to the fire and to the defendant is overwhelming. The evidence includes but is not limited to the following: the fact that the defendant admitted he set the fire by throwing bottles through the window; the fact that the night of the fire he had access in Isabell Jackson's apartment to Smirnoff bottles and cloth towels identical to the components of the intact Molotov cocktail found at the scene; the fact that an individual consistent in size and shape with the defendant left Isabelle Jackson's apartment building shortly before the fire carrying a bag, and then returned a short while later without the bag; the fact that the scene of the fire is within easy walking distance of the fire; the fact that the intact Molotov cocktail was found near to the broken window to the Brown apartment; the fact that the fire was started when somebody broke the window; and the fact that, notwithstanding that remnants could not be located after the fire suppression efforts, Norman Drayton observed what appeared to be a piece of a Molotov cocktail inside the apartment immediately after it started.

The defendant also argues that the Molotov cocktail may not qualify as a destructive device given that investigators recovered only a relatively small amount of gasoline from the device. First, the defendant has cited no authority for the proposition that some minimum quantity of ignitible liquid must

be present in order for a device to constitute a destructive device. Second, given that there was a strong odor of gasoline at the location where the device was found, and given that soil from that area tested positive for the presence of gasoline residue, it is altogether likely that gasoline initially present in the device leaked out into the soil between the time it was left or dropped and the time it was recovered from beneath the barrel after the fire had been suppressed.

**Surveillance Videotape**

The defendant also seeks under Fed. R. Evid. 403 to exclude the surveillance videotape depicting a man appearing to have the same general size, shape, and overall appearance as the defendant leaving Isabelle Jackson's building shortly before the fire carrying a bag and returning a short while later without the bag. The defendant contends that there is no admissible lay witness who will positively identify the defendant as the person depicted in the videotape; that the government cannot prove that the person depicted set the fire; and that the jury is likely to conclude that the person depicted is the defendant simply by virtue of the video being shown at the defendant's trial. The Court should reject the defendant's effort to preclude use of the videotape.

First, the jury will be able rationally and readily to conclude that the person depicted is the defendant. As argued

below, even though the government does not anticipate calling a witness who will be able to positively identify the person in the videotape as the defendant, the government does anticipate that witnesses will be able to testify that the defendant person depicted is consistent in size, shape, and overall appearance with the defendant.[2]  The government also anticipates that witnesses will be able to testify that the coat depicted in the video is consistent in appearance with a coat sometimes worn by the defendant at the time of the fire.  In addition, Isabelle Jackson woke up to the sound of the defendant entering her apartment somewhere around 4:30 a.m.  Wholly apart from the defendant's admission to Ms. Jackson that he started the fire, this evidence shows the defendant to have been out and about at the time the person depicted in the video footage returned to the building.

   The jury also will be able rationally and readily to conclude that the person depicted in the videotape was involved in setting the fire.  The surveillance equipment captured this individual leaving Ms. Jackson's building at around 4:15 in the

---

[2] Moreover, surveillance footage from earlier in the morning clearly depicts the defendant as he is leaving and returning to the building to help Isabelle Jackson park her car.  (He is wearing one of Isabelle Jackson's coats during this footage, which is different from the jacket worn later.)  This footage shows the size and shape of the defendant to be consistent with the size and shape of the person leaving and returning to the building just before and just after the fire started.

morning carrying what appears to be a bag containing items that appear consistent in shape with bottles. The videotape then depicts the individual returning to the building at approximately 4:36 a.m., this time not carrying anything. The Cambridge Fire Department, as noted above, responded to the fire at around 4:32 a.m. Again, wholly apart from the defendant's admissions to Isabelle Jackson about having started the fire by throwing bottles into the house, this evidence, when combined with the evidence of the Molotov cocktail found outside the Building and the evidence that Isabelle Jackson kept Smirnoff Ice empties on her porch, leads compellingly to an inference that the individual who left and returned to Ms. Jackson's building was involved in the nearby fire.

**Testimony Regarding Identity of Person in Surveillance Video**

The defendant also contends that any less-than-positive identification of the person depicted in the surveillance videotape as the defendant from a witness such as Rhonda Oyuela should be excluded.[3] The defendant concedes that lay opinion testimony as to the identity of an individual in a surveillance photograph is admissible where the witness possesses familiarity with the appearance of the defendant greater than that of the jury, and where the surveillance photograph is neither so clear

---

[3] At this juncture, the government does not anticipate offering testimony of a law enforcement officer regarding the identity of the person depicted in the tape.

nor so obscure that such testimony is not helpful to the jury. United States v. Jackman, 48 F.3d 1 (1st Cir. 1995)[4]; see also United States v. Kornegay, 410 F.3d 89, 94-96 (1st Cir. 2005). The defendant argues that here, however, Ms. Oyuela has not stated with certainty that the individual in the video is the defendant, but instead has indicated that the individual looks like the defendant and that the jacket worn looks like one she had seen the defendant wearing. The defendant maintains that this "does not constitute a valid identification, and thus it has no probative value, while being extremely prejudicial to defendant." Def. Mem. at 10.

But nothing in Jackman suggests that lay opinion testimony of this ilk is admissible only where the witness is positive about an identification. Here, the defendant's claim that Ms. Oyuela's testimony has no probative value is untenable. Ms. Oyuela was familiar with the defendant's appearance at the time of the fire, including specifically his appearance in a jacket like the one depicted in the surveillance video. The face of the individual in the video is largely obscured by the hood of the jacket, but the video otherwise provides a fair image of the individual and his outer clothing. Ms. Oyuela, with her familiarity both with the defendant's appearance in general and

---

[4] This Court is fully familiar with the Jackman case, having presided over the trial.

his appearance in a winter jacket in particular, see Jackman, 48 F.3d at 5, is plainly in a better position than the jury to opine that the image in the surveillance video is consistent with the defendant's appearance, even though she cannot say with certainty that it is him.[5]

**Fingerprint Testimony**

As set forth previously, a Massachusetts State Police fingerprint examiner attempted to develop latent fingerprints on the Molotov cocktail but was unsuccessful. The defendant does not seek to preclude this testimony, but instead seeks to preclude testimony from the expert regarding factors that can contribute to such a negative result, claiming that such testimony is not relevant. Def. Mem. at 12.

The defendant recognizes, however, that similar evidence was adduced in United States v. Carpenter, 403 F.3d 9, 10 & n.1 (1st Cir. 2005), in which a fingerprint expert explained that it is

---

[5]The defendant also suggests that the "procedure" whereby Ms. Oyuela first viewed a still image from the surveillance video was unduly suggestive. Def. Mem. at 11. The defendant cites no case for the proposition that the body of law dealing with suggestive identifications even applies in this context. Generally in identification cases, one deals with situations in which a witness has gotten a fleeting look at a perpetrator whom the witness does not know and later is confronted with photographs or a lineup. Here, by contrast, Ms. Oyuela did not get a fleeting look but rather was shown a still image that she had the luxury of time to examine in determining whether she recognized the person depicted. Moreover, the defendant does not suggest what else investigators could do other than show her the image and ask if she recognized the person.

difficult to lift viable prints from the firearm at issue in order to counter the defendant's claim that no fingerprints had been found on the gun. Indeed, this Court is aware that such testimony often is elicited in felon-in-possession cases. The testimony here is intended simply to educate the jury with respect to basic facts regarding fingerprints and common reasons that can account for the inability to develop latent prints on a surface such as a bottle. In an environment in which popular television shows such as *CSI* create unrealistic and unfounded expectations regarding forensic science in general and fingerprint recovery in particular, the government is entitled to present not only evidence of its unsuccessful efforts to develop prints in this case but also evidence that such a result is not surprising.

**Statements of Lisa Jackson**

During the altercation with Ms. Brown and Mr. Drayton, Lisa Jackson, among many other things, indicated that her boyfriend would kill them or fire them out. The defendant maintains that no hearsay exception applies to these statements. This, however, is incorrect. Ms. Jackson's implicitly reflect an intent on her part to report the altercation to her boyfriend and to attempt to prompt retaliation. A declarant's out-of-court statement regarding her intent to take future action falls within the state-of-mind exception to the hearsay rule. Fed. R. Evid.

803(30; see Minh Tu v. Mut. Life Ins. Co. Of New York, 136 F.3d 77, 81 (1st Cir. 1998)(out-of-court statement of declarant regarding intention to visit Cambodia admissible as evidence that declarant acted in accordance with stated intention); see also Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285 (1892). The statements are admissible here as some evidence that Ms. Jackson acted on her stated intent and communicated the altercation, and her suggested response, to the defendant.

**Crack Pipe**

Absent the defendant's opening the door at trial to the introduction of evidence regarding the defendant's possession of a crack pipe, the government does not intend to offer such evidence.

**Defendant's Convictions**

The defendant, who has no fewer than six separate sets of convictions sustained between 1999 and the present, proposes that, should he take the stand at trial, inquiry into his convictions should be precluded. The government disagrees.

Under Fed. R. Evid. 609(a)(1), a defendant's prior convictions for offenses punishable by more than a year in prison are admissible for impeachment purposes if the Court determines that the probative value of a conviction outweighs the prejudicial effect to the defendant. See United States v. Brito, 427 F.3d 53 (1st Cir. 2005). The First Circuit recognizes that

the Rule evinces a valid legislative judgment that felony convictions of any description have some value for impeachment purposes, and that the nature of the conviction goes to the balancing of evidential weight versus prejudice. Id. at 64. Among the factors the First Circuit has recognized as relevant to the calculus are (1) the impeachment value of the convictions; (2) their immediacy or remoteness; (3) the degree of potential prejudice; (4) the importance of the defendant's testimony; and (5) the salience of the credibility issue. Id.

Here, the balance tips in favor of admitting most of the defendant's convictions. First, some of them – the convictions for credit card misuse, receipt of stolen property, and possession of burglarious tools – have a clear bearing on veracity. See, e.g., United states v. Del Toro Soto, 676 F.2d 13 (1st Cir. 1982); United States v. Rogers, 41 F.3d 25 (1st Cir. 1994). Second, they are not unduly remote, but rather occurred with disturbing regularity between 1999 and 2003. Third, the degree of prejudice is minimal, inasmuch as none of the convictions are for arson or any similar offense. Finally, if the defendant were to take the stand, credibility would plainly be a central issue in the case. To preclude evidence of the defendant's convictions would keep from the jury evidence key to its ability to access the defendant's truthfulness on the stand.

Accordingly, the defendant's effort to keep his convictions

from the jury in the event he testifies should be denied.

## CONCLUSION

For the foregoing reasons, except to the extent agreed to herein, the defendant's motion in limine should be denied.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  /S/Robert E. Richardson
ROBERT E. RICHARDSON
Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I, Robert E. Richardson, hereby certify that this documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on March 6, 2006.

/s/Robert E. Richardson
ROBERT E. RICHARDSON
